**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**Amanda Zwald**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**AT&T Inc.,**

Defendant.

Case No. 24-cv-4489

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

AT&T Inc. ("AT&T") is the largest telecommunications company in the United States, and it stores and controls millions of customer's personal data, both current and former. In early 2024, cyber hackers breached AT&T's negligently designed and maintained cyber security, leading to a loss of over 73 million customers' sensitive data. This suit seeks to recover all damages associated with this breach and AT&T's failure to protect its clients' data. All allegations made herein are upon information and belief, based on personal facts, news reports, and counsel investigation.

## PARTIES

1. Plaintiff Amanda Zwald is, and at all relevant times was, a citizen and resident of the State of Illinois, Cook County. Plaintiff Zwald was an AT&T customer who contracted with AT&T to provide telecommunication services and protect her data.

2. AT&T is the nation's largest telecommunications company and provides wireless internet services, cellular phone and data services, and normal telephone service, among other things. It handles hundreds-of-millions of customers' sensitive data and generates billions of dollars in revenue every year. AT&T is a corporation organized under the state laws of Delaware with its headquarters and principal place of business located in Dallas Texas.

**JURISDICTION AND VENUE**

3. This Court has subject-matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332 et seq., because the amount in controversy is more than $5 million, not including interest and costs, and the number of class Members exceeds 100, with citizenship in nearly every state in the union. To the extent supplement jurisdiction might be required, the Court has it under 28 U.S.C. § 1367: all state-law claims here form part of the same case or controversy.

4. This Court has personal jurisdiction over AT&T because AT&T has committed acts within this district giving rise to this action and established minimum contacts with this district through the advertisement, selling, and providing of telecommunications services here.

5. Venue is proper in this Court under 28 U.S.C. § 1392 (b)(2) because a substantial part of the events at issue in this case, both actions and failures to act, occurred in this district.

## FACTUAL ALLEGATIONS

### A. AT&T Solicits and Collects Private Information From Its Customers

6. AT&T is the largest telecommunications provider in the United States. It contracts with hundreds-of-millions of customers, and in so doing, requires customers to provide sensitive personal information, from names and addresses to Social Security numbers and dates of birth and account numbers and passcodes.

7. AT&T sometime contracts with other parties to whom AT&T provides its customers private data and who it should ensure takes proper safeguards to keep safe all past and present customer data.

8. AT&T represented, in uniform, written documents, to its customers that it has state-of-the art, robust cyber security to guard customers' personal data and that it will do so – i.e., safeguard customers' personal data. It also represents through uniform writings that it will destroy customers' personal data when it is no longer needed for business, tax, or legal purposes. Finally, AT&T represents in uniform writings that it will notify customers if their customer data is breached.[1]

9. In the ordinary course of providing telecommunications services, customers must provide AT&T access to certain Private Information, including names, addresses, email addresses, phone numbers, social security numbers, dates of birth, and

---

[1] *AT&T Privacy Notice*, AT&T, https://about.att.com/privacy/privacy-notice.html (last visited May 15, 2024).

other information not generally available to the public. AT&T also collects the following types of personal data:

**The information we collect**

> To better run our business, we collect information about you, your equipment and how you use our products and services. This can include:
>
> a. **Account information.** You give us information about yourself, such as contact and billing information. We also keep service-related history and details, including Customer Proprietary Network Information.
>
> b. **Equipment information.** We collect information about equipment on our network like the type of device you use, device ID, and phone number.
>
> c. **Network performance.** We monitor and test the health and performance of our network. This includes your use of Products and Services to show how our network and your device are working.
>
> d. **Location information.** Location data is automatically generated when devices, products and services interact with cell towers and Wi-Fi routers. Location can also be generated by Bluetooth services, network devices and other tech, including GPS satellites.
>
> e. **Web browsing and app information.** We automatically collect a variety of information which may include time spent on websites or apps, website and IP addresses and advertising IDs. It also can include links and ads seen, videos watched, search terms entered and items placed in online AT&T shopping carts. We may use pixels, cookies and similar tools to collect this information. We don't decrypt information from secure websites or apps – such as passwords or banking information.
>
> f. **Biometric information.** Fingerprints, voice prints and face scans are examples of biological characteristics that may be used to identify individuals. Learn more in our Biometric Information Privacy Notice.
>
> g. **Third-party information.** We get information from outside sources

> like credit reports, marketing mailing lists and commercially available demographic and geographic data. Social media posts also may be collected, if you reach out to us directly or mention AT&T.

Together, all of these types of data referred to in this paragraph (and information like it also collected by AT&T) is referred to as Personal Information herein.

10. This Personal Information, within AT&T's possession, can reasonably be linked to an identifiable person or household. For instance, information is personal when it can be linked to your name, account number, or device.

11. Within AT&T's Privacy Notice, AT&T states the following about keeping Personal Information private and secure:

> Thank you for reading our Privacy Notice. *Your privacy is important to you and to us*.
>
> …
>
> This notice applies to AT&T products and services including internet, wireless, voice and AT&T apps.
>
> …
>
> **Your privacy choices and controls**
>
> You can manage how we use and share your information for certain activities including advertising and marketing. Here are key examples:
>
> **Do not sell or share my personal information.** We may share information with other companies in limited ways, such as exchanging subscriber lists for joint marketing.
>
> …
>
> **Data retention and security**
>
> We work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network

> equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information.
>
> *No security measures are perfect. We can't guarantee that your information will never be disclosed in a manner inconsistent with this notice. If a breach occurs, we'll notify you as required by law.*[2]

12. Thus, because of the highly sensitive and personal nature of the information it acquires, AT&T promises in its Privacy Notice to, among other things, maintain the privacy and security of Personal Information, such information hereinafter referred to as Private Information or PII.

13. As a condition of receiving telecommunications services, AT&T requires that its customers entrust it with this highly sensitive personal information.

14. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and the Class's Private Information, AT&T assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class's Private Information from disclosure.

15. Plaintiff and the Class have taken reasonable steps to maintain the confidentiality of their Private Information.

16. Plaintiff and the Class relied on AT&T to keep their Private Information confidential and securely maintained, to use this information for business purposes

---

[2] *See* AT&T Privacy Notice, https://about.att.com/privacy/privacy-notice.html (last accessed Apr. 26, 2024).

only, and to make only authorized disclosures of this information, and inform them promptly if that information had been breached.

17. AT&T knew or should have known that it had a duty to protect its current and past customers' personal data and that the failure to protect it could harm its customers.

**B. AT&T's Faulty Cyber Security Leads to Tens-of-millions of Customers' Private Information Being Compromised.**

18. In 2021, AT&T learned its protections were not adequate. In that year or earlier, AT&T discovered that ShinyHunters, a criminal hacking group, was auctioning off private, personal data of its customers on a hacker forum/marketplace. ("2021 Data Incident.") The starting price for seventy million Social Security numbers and dates of birth? $200,000. An immediate purchase could be made for $1 million.[3]

19. Upon learning of this auction, AT&T publicly stated the information did not come from its data servers and could not "speculate" on where the information came from, even if it might be from one of its third-party partners.[4]

[3] Waqas, *AT&T breach? ShinyHunters selling AT&T database with 70 million SSN*, HACKREAD (Aug. 20, 2021), https://www.hackread.com/att-breach-shinyhunters-database-selling-70-million-ssn/

[4] Lawrence Abrams, *AT&T denies data breach after hacker auctions 70 million user database*, BLEEPINGCOMPUTER (Aug. 20, 2021, 9:43 AM), https://www.bleepingcomputer.com/news/security/atandt-denies-data-breach-after-hacker-auctions-70-million-user-database/

20. AT&T then ignored the ShinyHunters hacking incident, failed to notify its past and current customers, and continued business as normal.

21. In March 2024, AT&T learned the same information from the ShinyHunters hacking was still for sale. This time, MajorNelson, another cyber hacker, posted the entire ShinyHunters database on a hacking forum, with free access to all. This data includes names, addresses, mobile phone numbers, birth dates, and Social Security numbers. This leak was confirmed by BleepingComputer, a data breach media outlet. These two breaches are collectively referred to hereinafter as "the Data Breach."[5]

22. AT&T has now admitted its customers' personal data—their Private Information—has been breached[6] and is now available to all through the "dark web."

23. Online data breach researchers have confirmed that the AT&T data that has been breached include millions of current and former customers.[7]

---

[5] Lawrence Abrams, *AT&T says leaked data of 70 million people is not from its systems*, BLEEPINGCOMPUTER (Mar. 17, 2024, 7:24 PM), https://www.bleepingcomputer.com/news/security/att-says-leaked-data-of-70-million-people-is-not-from-its-systems/.

[6] https://www.att.com/support/article/my-account/000101995 (last accessed April 23, 2024).

[7] "AT&T notifies users of data breach and resets millions of passcodes," https://apnews.com/ article/att-data-breach-dark-web-passcodes-fbef4afe0c1deec9ffb470f2ec134f41;
"Inside the Massive Alleged AT&T Data Breach," https://www.troyhunt.com/inside-the-massive-alleged-att-data-breach/.

24. Since the original ShinyHunters hacking incident up to March 2024, AT&T had not determined which systems or sets of data were breached, confirmed its security systems are protected from a similar attack in the future, or whether its third-party partners, whom might also have access to its customers data, have adequate cyber security to ensure these breaches will not occur again.

25. As a result of the data breaches discussed herein, Plaintiff and the Class have been harmed through the leaking and public access to their Private Information.

26. As a result of the Data Breach, Plaintiff and the Class have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft more than they would have absent this data breach.

27. Plaintiff and the Class may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

28. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

29. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to AT&T's data security protocols, future annual audits, and adequate credit monitoring services funded by AT&T.

30. AT&T had obligations created by express and implied contract, industry standards, common law, and statute, based on representations made to Plaintiff and the Class, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

31. Plaintiff and the Class provided their Private Information to AT&T with the reasonable expectation and mutual understanding that Private Information would comply with their obligations to keep such information confidential and secure from unauthorized access.

32. AT&T's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches preceding the date of the breach.

33. In light of recent high profile data breaches at other companies, AT&T knew or should have known that electronic records would be targeted by cybercriminals.

34. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

35. Therefore, the increase in such attacks, and attendant risk of future

attacks, was widely known to the public and to anyone in AT&T's industry, including AT&T.

36. AT&T failed to implement adequate data security measures to safeguard Plaintiff's and Class's Private Information as evidenced by the database stolen by ShinyHunters in 2021 and by the full leak of about 73 million individuals' Private Information by MajorNelson in 2024, nearly three years after the 2021 Data Incident.

37. Despite the first Data Incident having occurred in August 2021 (and again in March 2024), AT&T has made no effort to notify the public about the severity of the Data Breach until April 2024. Nor has AT&T given potential victims of the Data Breach instructions on how to keep their Private Information safe.

38. Even though the Private Information at issue has been compromised and leaked for about two and a half years, AT&T has done nothing to get that leaked Private Information taken down from places where the Private Information should not be, such as in the aforementioned Internet *fora*, which are on the Clear Web.

39. Further, as of the date the breach was revealed, AT&T had not done anything to determine the source of the Data Breach. This is evidenced by AT&T's reluctance to confirm whether the Data Breach may be attributed to a third-party partner to whom AT&T entrusted the processing and safekeeping of a substantial amount of Plaintiff's and Class's Private Information.

40. Considering that the Data Breach likely occurred as a result of malicious actors— such as ShinyHunter and MajorNelson—exploiting a data security weakness in

one of AT&T's third-party processors of Private Information, AT&T failed to adequately verify the adequacy of security measures, if any, that such third-party processors had in place meant to protect the Private Information.

**C. AT&T Violated Numerous FTC Guidelines.**

41. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

42. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[8]

43. The FTC further recommends that companies not maintain PII longer than

[8] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed April 23, 2024).

is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

44. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

45. AT&T failed to properly implement basic data security practices. AT&T's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information is an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45

46. Experts studying cyber security routinely identify companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

47. Several best practices have been identified that a minimum should be implemented by companies like AT&T, including but not limited to ensuring Private Information is only shared with third parties when reasonably necessary and that those

vendors have appropriate cybersecurity systems and protocols in place.

48. A number of industry and national best practices have been published and should be used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security ("CIS") released its Critical Security Controls ("CSC"), and all businesses are strongly advised to follow these actions.[9] The CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.

49. Other best cybersecurity practices that are standard in the telecommunications industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, security systems; protection against any possible communication system; and training staff regarding critical points.

50. Cyberattacks and data breaches on businesses are problematic because of the increased risk of fraud and identity theft.

51. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity

---

[9] *See* Center for Internet Security Critical Security Controls, https://www.cisecurity.org/controls (last visited April 29, 2024).

theft will face substantial costs and time to repair the damage to their good name and credit record.[10]

52. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims and take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

53. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert, reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

54. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

[10] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/search?keyword=GAO-07-737 (last visited May 29, 2024).

55. Identity thieves can use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. Also, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

56. Moreover, theft of Private Information is also gravely serious. PII is a valuable property right.

57. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

58. It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information is stolen and when it is used.

59. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to

> measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

60. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

61. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class are at an increased risk of fraud and identity theft for many years into the future.

62. Thus, Plaintiff and the Class must vigilantly monitor their financial accounts and other types of accounts for many years to come.

63. Sensitive Private Information can sell for as much as $363 per record. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.[11]

---

[11] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC, https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the- black-market/ (July 27, 2015).

64. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[12] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

65. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as the credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number.

66. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

[12] *See* https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 29, 2024).

67. Because of the value of its collected and stored data, the telecommunications industry has experienced disproportionally higher numbers of data theft events than other industries.

68. For this reason, AT&T knew or should have known about these dangers and strengthened its data protocols accordingly. AT&T was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**D. The Data Breach was Foreseeable and Preventable**

69. Following the Data Breach, AT&T stated that it takes "cybersecurity very seriously and privacy is a fundamental commitment at AT&T."[13]

70. But AT&T, like any company of its size that stores massive amounts of sensitive PII, should have had robust protections in place to detect and terminate a successful intrusion long before access and exposure of customer data. AT&T also should have exercised appropriate managerial control over their third-party partners' data security when it knew these partners stored its customers' PII in carrying out the business of their partnership. AT&T's failure to prevent the breach is inexcusable given its knowledge that it and its affiliates are prime targets for cyberattacks.

71. In 2022, the National Security Agency (NSA), the Cybersecurity and Infrastructure Security Agency (CISA), and the Federal Bureau of Investigation (FBI)

---

[13] "Keeping Your Account Secure," https://www.att.com/support/article/my-account/000101995?bypasscache=1/%3Fsource%3DEPcc000000000000U.

coauthored the joint Cybersecurity Advisory explicitly highlighting "[t]elecommunications and network service provider targeting" by cyber actors.[14] The Advisory explains how cyber actors exploit and access telecommunication organizations and network service providers though the use of open-source tools "that allows for the scanning of IP addresses for vulnerabilities." Once these cyber actors gain an initial foothold, they identify "critical users and infrastructure including systems critical to maintaining the security of authentication, authorization, and accounting."

72. In addition to the Advisory, a 2023 report from cyber intelligence firm Cyble noted that U.S. telecommunications companies are a lucrative target for hackers. According to the study, the majority of data breaches stem from third-party vendors. "These third-party breaches can lead to a larger scale supply-chain attacks and a greater number of impacted users and entities globally…"[15] Thus, whether the data breach occurred through AT&T's own systems or its third-party vendors, AT&T was responsible for the protection of customers' PII.

73. And AT&T recognized these risks in its own regulatory filings. For

[14] *People's Republic of China State-Sponsored Cyber Actors Exploit Network Providers and Devices,* CISA.GOV, https://media.defense.gov/2022/Jun/07/2003013376/-1/-1/0/CSA_PRC_SPONSORED_CYBER_ACTORS_EXPLOIT_NETWORK_PROVIDERS_DEVICES_TLPWHITE.PDF (last visited Apr. 1, 2024).

[15] https://cyble.com/blog/u-s-telecommunications-companies-targeted-consumers-hit-hardest/?utm_source=newsletter&utm_medium=email&utm_campaign=newsletter_axioscodebook&stream=tope#_ga=2.42536483.783648717.1711826278195860195 9.1709241562.

instance, in its 2023 Annual Report, AT&T acknowledged the business risk of suffering a cyber security incident and the need to manage third-party risk from vendors:

> **Risk Management and Strategy**
>
> We maintain a network and information security program that is reasonably designed to protect our information, and that of our customers, from unauthorized risks to their confidentiality, integrity, or availability. Our program encompasses the CSO and its policies, platforms, procedures, and processes for assessing, identifying, and managing risks from cybersecurity threats, including third-party risk from vendors and suppliers; and the program is generally designed to identify and respond to security incidents and threats in a timely manner to minimize the loss or compromise of information assets and to facilitate incident resolution.
>
> We maintain continuous and near-real-time security monitoring of the AT&T network for investigation, action and response to network security events. This security monitoring leverages tools, where available, such as near-real-time data correlation, situational awareness reporting, active incident investigation, case management, trend analysis and predictive security alerting. We assess, identify, and manage risks from cybersecurity threats through various mechanisms, which from time to time may include tabletop exercises to test our preparedness and incident response process, business unit assessments, control gap analyses, threat modeling, impact analyses, internal audits, external audits, penetration tests and engaging third parties to conduct analyses of our information security program. We conduct vulnerability testing and assess identified vulnerabilities for severity, the potential impact to AT&T and our customers, and likelihood of occurrence. We regularly evaluate security controls to maintain their functionality in accordance with security policy. We also obtain cybersecurity threat intelligence from recognized forums, third parties, and other sources as part of our risk assessment process. In addition, as a critical infrastructure entity, we collaborate with numerous agencies in the U.S. government to help protect U.S. communications networks and critical infrastructure, which, in turn, informs our cybersecurity threat intelligence.
>
> **Cyberattacks impacting our networks or systems may have a material adverse effect on our operations.**
>
> Cyberattacks – including through the use of malware, computer viruses, distributed denial of services attacks, ransomware attacks, credential harvesting, social engineering and other means for obtaining unauthorized access to or disrupting the operation of our networks and systems and those of our suppliers, vendors and other service providers – could have a material adverse effect on our operations. Cyberattacks can cause equipment or network failures, loss of information, including sensitive personal information of customers or employees or proprietary information, as well as disruptions to our or our customers', suppliers' or vendors' operations, which could result in significant expenses, potential investigations and legal liability, a loss of current or future customers and reputational damage. As our networks evolve, they are becoming increasingly reliant on software to handle growing demands for data consumption. Cyberattacks against companies, including the Company and its suppliers and vendors, have occurred and will continue to occur and have increased in frequency, scope and potential harm in recent years. Further, the use of artificial intelligence and machine learning by cybercriminals may increase the frequency and severity of cybersecurity attacks against us or our suppliers, vendors and other service providers. Additionally, as cyberattacks become increasingly sophisticated, a post-attack investigation may not be able to ascertain the entire scope of the attack's impact. Extensive and costly efforts are undertaken to develop and test systems before deployment and to conduct ongoing monitoring and updating to prevent and withstand such attacks. While, to date, we have not been subject to cyberattacks that, individually or in the aggregate, have been material to our operations or financial condition, the preventive actions we take to reduce the risks associated with cyberattacks may be insufficient to repel or mitigate the effects of a major cyberattack in the future.

74. Aside from warnings from federal regulatory agencies and cyber intelligence firms, AT&T is no stranger to data breaches. Just a year ago, AT&T notified 9 million wireless customers that their customer information had been accessed in a breach of a third-party marketing vendor.[16] And in 2014, AT&T settled a

[16] https://www.cnet.com/tech/mobile/at-t-vendor-data-breach-exposed-9-million-customer-accounts/

Federal Communications Commission investigation of privacy violations for $25 million. That investigation stemmed from the exposure of about 280,000 U.S. customers' names and full or partial Social Security numbers.[17]

75. If not through its own history, AT&T surely understood the risk from its competitors. Considering recent high profile data breaches at other telecommunications companies, such as Xfinity (36,000,000 impacted, announced December 2023); T-Mobile (37,000,000 impacted, announced January 2023); and US-Cellular (52,000 impacted, announced March 2023), among others, AT&T knew or should have known that its data and consumers' PII would be, or had already been, targeted by cybercriminals.

76. To prevent unauthorized access, CISA encourages organizations to: conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices; regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data; ensure devices are properly configured and that security features are enabled; employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and disable an operating system network file sharing protocol known as Server Message Block (SMB), which is used by threat actors to travel

[17] https://www.cnbc.com/2015/04/08/att-data-breaches-revealed-280k-us-customers-exposed.html.

through a network to spread malware or access sensitive data.[18]

77. The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[19]

78. Consequently, AT&T knew of the importance of safeguarding PII and of the foreseeable consequences that would occur if their data security system were breached, including the significant costs and consequences that would be imposed on customers as a result of a breach.

79. Despite all of the publicly available knowledge of the continued compromises of PII and despite holding the PII of millions of customers, AT&T failed to use reasonable care in maintaining the privacy and security of the PII of Plaintiff and the Class.

80. Had AT&T implemented industry standard security measures, adequately invested in data security, and promptly investigated cybersecurity issues, unauthorized parties likely would not have been able to access AT&T's or its third-party vendors' systems and the Data Breach would have been prevented or, at least,

[18] https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf at 4.

[19] *Id*. at 5.

been much smaller in scope.

**E. AT&T's Customer's Private Information Was, And Is, Valuable.**

81. The PII of consumers remains of high value to criminals, as evidenced by the continued sale and trade of such information on underground markets found on the "dark web"— which is a part of the internet that is intentionally hidden and inaccessible through standard web browsers.

82. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[21] Criminals can also purchase access to entire company data

---

[20] Anita George, "Your personal data is for sale on the dark web. Here's how much it costs," DIGITALTRENDS, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[21] Zachary Ignoffo, *Dark Web Price Index 2021,* PRIVACYAFFAIRS.COM, https://www.privacyaffairs.com/dark-web-price-index-2021/ (Jun. 10, 2023).

breaches from $900 to $4,500.[22] Other sources show sensitive private information selling for as much as $363 per record.[23]

83. Data sets that include PII demand a much higher price on the black market. For example, the information likely exposed in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[24] The information likely disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

84. There is also an active and robust *legitimate* market for PII. In 2021, the data brokering industry alone was valued at $319 billion.[25] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly

---

[22] *For Sale in the Dark*, VPN OVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited April 23, 2024).

[23] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market,* INFOSEC, https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (July 27, 2015).

[24] See Jesse Damiani, Your Social Security Number Costs $4 on the Dark Web, New Report Finds, FORBES, https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=22bab2af13f1 (Mar. 25, 2020).

[25] Devan Burris, How grocery stores are becoming data brokers, CNBC, https://www.cnbc.com/2023/12/10/how-grocery-stores-are-becoming-data-brokers.html#:~:text=In%202021%20the%20data%20broker,better%20idea%20of%20%20consumer%20%20trends (Dec. 10, 2023, 12:00 PM).

to a data broker who in turn aggregates the information and provides it to marketers or app developers.[26] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[27]

85. Because their PII has independent value, Plaintiff and the Class must take measures to protect it including by, as AT&T's online notice instructs, placing "alerts" with credit reporting agencies, changing passcodes, and reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover and detect.

**F. Plaintiff Zwald Was Affected by the Breaches.**

86. Plaintiff Zwald had been a customer of AT&T for her home internet from approximately 2012 until December 2021.

87. In connection with obtaining AT&T's services, Zwald was required to provide highly sensitive personal information, including but not limited to her contact information, date of birth, and Social Security number. AT&T also required Zwald to create login credentials to access her accounts.

88. In the regular course of business, AT&T shared Zwald's information with several third-party partners for whom AT&T was obligated to verify their data security

---

[26] https://datacoup.com/#first-stop (last visited Jan. 17, 2024).

[27] *Nielsen Computer & Mobile Panel, Frequently Asked Questions,* NIELSEN, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 17, 2023).

practices because those third parties stored the information AT&T collected.

89. Zwald became aware of the data breach in late March 2023 and subsequently reviewed AT&T's online notice. The online notice recommends that customers take certain actions like resetting account passcodes and monitoring credit reports for activity and to detect errors. Furthermore, the online notice recommends that customers place a "fraud alert" on their credit report to detect any possible misuse of personal information.

90. As a result of the Data Breach, Zwald has spent time and effort researching the breach and reviewing her financial statements for evidence of unauthorized activity, which she will continue to do indefinitely.

91. Zwald also suffered emotional distress knowing that her highly personal information, such as her financial information and Social Security number, is no longer confidential and can be used for extortion, theft or fraud, and any number of additional harms against her for the rest of her life.

92. Because AT&T continues to store and share Plaintiff's and the Class's PII in the regular course of its business, they have a continuing interest in ensuring that the PII is protected and safeguarded from additional authorized access.

93. Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

94. Plaintiff received a communication from AT&T informing her that her Private Information had been breached in the Data Breach, like some 70 million other

former or current AT&T customers. Plaintiff also confirmed this breach through an internet site devoted to documenting cyber security breaches.

95. Plaintiff's and the Class's Private Information was compromised as a direct and proximate result of the Data Breach.

96. As a direct and proximate result of AT&T's conduct, Plaintiff and the Class have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

97. As a result of the Data Breach, the Private Information of over 73 million AT&T customers, including Plaintiff and the Class, are available on the Internet for users, including criminals, to find, search through, and download.

98. As a direct and proximate result of AT&T's conduct, Plaintiff and the Class have been forced to expend time and money dealing with the effects, or potential effects of this Data Breach.

99. Plaintiff and the Class face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and identity theft.

100. Plaintiff and the Class face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as criminals use that information to target them.

101. Plaintiff and the Class may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and

similar costs directly or indirectly related to the Data Breach.

102. Plaintiff and the Class also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach.

103. Plaintiff and Class were also damaged via benefit-of-the-bargain damages. They overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiff and the Class paid to AT&T was intended to be used by AT&T to fund adequate security of their Private Information. Thus, they did not get what they paid for.

104. Plaintiff and the Class have spent and will continue to spend significant amounts of time monitoring their financial accounts and records for misuse.

105. Plaintiff and the Class have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

- finding fraudulent charges;
- canceling and reissuing credit and debit cards;
- purchasing credit monitoring and identity theft prevention;
- addressing their inability to withdraw funds linked to compromised accounts;
- taking trips to banks and waiting in line to obtain funds held in limited accounts;
- placing “freezes” and “alerts” with credit reporting agencies;

- spending time on the phone with or at a financial institution to dispute fraudulent charges;
- contacting financial institutions and closing or modifying financial accounts;
- resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;
- paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled, and
- closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

106. Moreover, Plaintiff and the Class have an interest in ensuring that their Private Information, which is believed to remain in the possession of AT&T, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted, consistent with current industry standards and best practices.

107. Further, as a result of AT&T's conduct, Plaintiff and the Class are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of their right to privacy.

108. As a direct and proximate result of AT&T's actions and inactions, Plaintiff

and the Class have suffered a loss of privacy and are at an imminent and increased risk of future harm.

## CLASS ALLEGATIONS

109. Plaintiff seeks class certification under Federal Rule of Civil Procedure 23 for the following class:

> All persons or other entities whose personal information was accessed, compromised, copied, stolen, and/or revealed as a result of AT&T, Inc.'s Data Breach.

110. Excluded from the Class are AT&T, its officers and directors and Members of their immediate families, or their legal representatives, heirs, successors, or assigns and any entity in which AT&T has a controlling interest.

111. Plaintiff's claims should be certified because the elements of each may be proven on a class-wide basis, using the same evidence as would be used to the prove the same elements in separate actions.

112. The size of the class is enormous: over 70 million customers' Private Information was compromised in the Data Breach. It would be inefficient and impossible to litigate each class Member's claims individually.

113. Each claim in this case involves questions of fact and law common to all Class Members. These common questions predominate over any individual issues such as the potential for particularized damages. Such common questions of law or fact include:

a. whether AT&T's cybersecurity systems and/or protocols before and during the Data Breach complied with relevant data

security laws and industry standards;

b. whether AT&T properly implemented their purported security measures to safeguard Plaintiff's and Class Members' private information from unauthorized access, propagation, and misuse;

c. whether AT&T took reasonable measures to determine the extent of the Data Breach after it first discovered the same;

d. whether AT&T disclosed Plaintiff's and Class Members' Private Information in contravention of the understanding that the information was being revealed in confidence and should be maintained;

e. whether AT&T willfully, recklessly, or negligently failed to maintain and execute reasonable procedures and security controls to preclude unauthorized access to Plaintiff's and the Class Members' Private Information;

f. whether AT&T was unjustly enriched by its actions; and

g. whether Plaintiff and Class Members are entitled to damages, injunctive relief, or other equitable relief, and the extent of such damages and relief.

114. AT&T engaged in a common course of conduct in this case in terms of its protection of its customers' data. Accordingly, the same inaction or failures to act by AT&T as to Plaintiff apply to all Class Members.

115. Plaintiff's claims are typical of the claims of the Class. Plaintiff's information was compromised the same as all other Class Members and they were also all similarly injured and sustained similar monetary and economic injuries as a result of AT&T's misconduct. AT&T has no unique defenses to Plaintiff's claims that it does not also have with respect to other Class Members.

116. Plaintiff is an adequate class representative because her interests do not conflict with the Class's interests, she has retained competent and experienced counsel in complex class action litigation, and she will prosecute this action earnestly. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

117. AT&T acted and/or refused to act on grounds that apply generally to the Class.

118. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are small compared to the burden and expense that would be required to litigate their claims on an individual basis against AT&T.

119. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.

120. A class action in this case presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### Count 1: Negligence

121. All factual allegations in this complaint apply to this claim.

122. AT&T required, collected, and then maintained the non-public Private Information of its customers, including Plaintiff.

123. AT&T represented that it would keep private and safeguard all of its customers' Private Information.

124. AT&T's customers entrusted their Private Information to AT&T.

125. AT&T collected customers' Private Information and stored it on computer servers AT&T owned or controlled. AT&T shared this data with other entities and used it for commercial gain.

126. In collecting and storing its customers' Private Information, AT&T had a duty of care to use reasonable means to secure and safeguard that data and prevent its disclosure or theft.

127. AT&T's duty of care extended to any third parties it contracted with to collect, store, or share its customer's Private Information, and so AT&T was required to adequately vet all such third parties' data security protocols, procedures, and safeguards.

128. AT&T also enjoyed a special relationship with its customers for whom it collected, stored, and/or shared their Private Information.

Because AT&T was in a position to protect its customers' data and they were not, and

the risk of harm to its customers was a foreseeable risk, AT&T owed a duty of care to use reasonable security measures to protect that data.

129. AT&T also owed a duty of care based on industry standards to protect customers' Private Information.

130. AT&T owed a duty of care based on federal statute, as well. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

131. AT&T was negligent and breached its duties of care by failing to use reasonable measures to protect its customers' Private Information and by failing to properly vet its third-party contractors' protection measures to verify that they, too, were reasonable and adequate.

132. Any reasonable actor in the telecommunication industry could foresee that a failure to use reasonable measures could result in harm to its customers. AT&T itself foresaw this risk and harm and yet failed to use reasonable and adequate protection measures.

133. AT&T knew that it had in the past experienced a high frequency of cyberattacks, that telecommunications companies were particularly target-rich companies for cyber criminals and that such attacks would occur at high frequency in the future to a high degree of probability.

134. Plaintiff and the Class seek compensatory and consequential damages suffered as a result of the Data Breach.

135. Plaintiff and the Class also seek injunctive relief that will ensure their Private Information is not stolen or compromised again, including but not limited to:

(i) an order requiring AT&T to add more security features and protections to its stored customer data;

(ii) future annual audits for the next seven years of AT&T's cyber security by the Court and shared with Plaintiff's counsel;

(iii) lifetime subscriptions to credit monitoring agencies to ensure no identity theft or other future harm to Plaintiff and the Class stemming from AT&T's negligence.

**Count 2: Negligence *per se***

136. All factual allegations in this complaint apply to this claim.

137. The FTCA protects and was intended to protect Plaintiff and the Class.

138. The FTCA protects, and was intended to protect, the harm at issue in this complaint. In the past, the FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that here.

139. AT&T breached its statutory duties by failing to employ industry standard data and cybersecurity measures.

140. AT&T could reasonably, and did, foresee that its failure to reasonably protect its customers' Private Information would result in a breach of that information and harm to Plaintiff and the Class.

141. Plaintiff's and Class's Private Information is personal property. That property was stolen because of AT&T's negligence.

142. Plaintiff and the Class have been injured, harmed, and damaged by the theft of their property and this was foreseeable and proximately caused by AT&T's negligence in protecting its customers' Private Information.

143. AT&T violated the FTCA and owes damages and any other appropriate relief under that statute to cure its breaches and compensate its customer for all past and future damages that will result.

**Count 3: Breach of Implied Contract**

144. All factual allegations in this complaint apply to this claim.

145. AT&T and its customers entered into binding contracts through their joint course of conduct by which its customers would provide their Private Information to AT&T, from which AT&T derived a benefit, and AT&T would provide safe and secure handling and storing of that information.

146. Plaintiff and each Class Member entered into a valid and enforceable implied contract with AT&T by providing their Private Information.

147. The valid and enforceable implied contracts with AT&T include the promise to protect information that AT&T creates on its own from its customers' disclosures.

148. AT&T solicited and invited Plaintiff and the Class to provide their Private Information as part of AT&T's regular business practices. Plaintiff and Class Members accepted AT&T's offers and provided their Private Information to AT&T.

149. In entering into such implied contracts, Plaintiff and Class reasonably believed and expected that AT&T's data security practices complied with relevant laws and regulations and were consistent with industry standards.

150. The protection of Plaintiff's and Class Members' Private Information were material aspects of these implied contracts.

151. AT&T's express representations, including the representations found in its Privacy Notice, evidence the implied contractual obligations of AT&T to which it and Plaintiff and the Class agreed.

152. Plaintiff and the Class Members value their own privacy and the privacy of their dependents.

153. Companies that do not offer industry standard data security protocols to protect Private Information provide fundamentally less useful and valuable services than those that due. As a result, those who do not offer appropriate data security measures to protect consumer information have fewer customers or must charge a much lower price.

154. No reasonable consumer would have entered into a contract—express or implied—with AT&T to provide them with Private Information or to seek

telecommunications services if they knew AT&T's data security was not reasonable or not up to industry standards.

155. Plaintiff and the Class would not have entered into any implied or express contract with AT&T if they knew AT&T's data security was not reasonable or not up to industry standards.

156. AT&T and Plaintiff and the Class had a meeting of the minds regarding their implied contract, where Plaintiff and Members of the Class agreed and provided their Private Information to AT&T, and AT&T agreed to protect that information.

157. Plaintiff and Class Members performed their obligations under the contract by providing their Private Information to AT&T.

158. AT&T materially breached its contractual obligation to protect Plaintiff's and the Class's Private Information by allowing it to be stolen by the cyberattacks and Data Breach.

159. As a result of AT&T's breach, Plaintiff and the Class did not receive the full benefit of their bargain and were thereby damaged.

160. As a foreseeable result of AT&T's breach, Plaintiff and the Class have been harmed and will continue to be harmed and suffer actual damages and injuries associated with the public disclosure of their Private Information.

161. Plaintiff and the Class thereby seek compensatory and consequential damages suffered as the result of AT&T's breach.

162. Plaintiff and the Class also seek injunctive relief that will ensure their Private Information is not stolen or compromised again, including but not limited to:

(i) An order requiring AT&T to add more security features and protections to its stored customer data;

(ii) Future annual audits for the next seven years of AT&T's cyber security by the Court and shared with Plaintiff's counsel;

(iii) Lifetime subscriptions to credit monitoring agencies to ensure no identity theft or other future harm to Plaintiff and the Class stemming from AT&T's negligence.

**Count 4: Breach of Express Contract**

163. All factual allegations in this complaint apply to this claim.

164. AT&T sent uniform documents to all of its customers with a provision titled "Privacy Notice" that constituted an agreement between AT&T and its customers who provided their Private Information to AT&T, including the Plaintiff and the Class.

165. Plaintiff and the Class formed a contract with AT&T and satisfied all obligations under that contract by providing their Private Information to AT&T subject to the Privacy Notice.

166. AT&T promised in its Privacy Notice that it worked hard to safeguard customers' information by using technology controls and organizational controls. AT&T further promised that it limited access to personal information to the people who need access for their jobs. AT&T also promised that when customers Private Information is no longer needed for business, tax or legal purposes, that it will destroy it by making it unreadable or indecipherable. And in the event of a data breach, AT&T promised it will notify customers promptly.

167. AT&T breached its written agreements with Plaintiff and the Class when AT&T allowed the disclosure of Plaintiff's and the Class's Private Information without their authorization and in a manner that was inconsistent with the permissible authorizations set forth in Privacy Notice.

168. AT&T also breached its written agreements with Plaintiff and the Class by failing to maintain the confidentiality of their Private Information.

169. As a direct and proximate result of these breaches, Plaintiff and the Class sustained actual losses and damages as alleged herein, including the failure to receive the benefits of their bargains for which they paid and for which they seek to recover. Plaintiff and the Class alternatively seek an award of nominal damages.

**Count 5: Unjust Enrichment**

170. All factual allegations in this complaint apply to this claim.

171. Plaintiff and the Class purchased goods and services from AT&T and in so doing provided AT&T with their Private Information. In exchange, Plaintiff and Class Members should have received from AT&T the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

172. AT&T knew that Plaintiff and Class Members conferred a benefit, which AT&T accepted. AT&T profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

173. The amount Plaintiff and Class Members paid for goods and services were used, in part, to pay for use of AT&T's network and the administrative costs of data management and security.

174. Under the principles of equity and good conscience, AT&T should not be permitted to retain the money belonging to Plaintiff and Class Members, because AT&T failed to implement appropriate data management and security measures that are mandated by industry standards.

175. AT&T failed to secure Plaintiff's and Class Members' personal, private information and did not fully compensate Plaintiff and Class Members for the benefit they provided.

176. AT&T acquired Plaintiff's and the Class's personal, private information through inequitable means, including by hiding its inadequate security practices.

177. If Plaintiff and the Class knew of AT&T's inadequate security practices, they would not have agreed to AT&T's services or AT&T would have been forced by market pressures to offer a lower price for those services.

178. Pled with and in the alternative to the contract claims, Plaintiff and the Class have no adequate remedy at law.

179. As a direct and proximate result of AT&T's conduct, Plaintiff and the Class have suffered and will suffer injury, including:

(a) identity theft;

(b) the loss of the opportunity regarding the use of their Private Information;

(c) the publication, theft, or use of their private, personal information;

(d) out-of-pocket expenses and lost opportunity costs associated with their efforts to prevent, detect, and recover from identity theft or the unauthorized use of their personal, private information; and

(e) the continued risk of future breaches of their personal, private information.

180. AT&T should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, AT&T should be compelled to refund the amounts that Plaintiff and Class Members overpaid for AT&T's services.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

(i) An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

(ii) Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

(iii) An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

(iv) An order instructing AT&T to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

(v) An order requiring AT&T to pay the costs involved in notifying Class Members about the judgment and administering the claims process; and

(vi) A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law.

DATED: May 30, 2024

Respectfully submitted,

*/s/ Matthew T. Hurst*

**HEFFNER HURST**
Matthew T. Heffner
E-Mail: mheffner@heffnerhurst.com
Matthew T. Hurst
E-Mail: mhurst@heffnerhurst.com
30 N. LaSalle Street
Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466

**TADLER LAW LLP**
Ariana J. Tadler
(*Pro Hac Vice to be Filed)*
A.J. de Bartolomeo
(*Pro Hac Vice to be Filed)*
22 Bayview Avenue, Suite 200
Manhasset, NY 11030
Telephone: (212) 946-9300
Email: atadler@tadlerlaw.com
ajd@tadlerlaw.com

*Proposed Class Counsel for Plaintiff Zwald*